UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

VICKY SLOTH,                                           **VERIFIED
                                                        COMPLAINT**

                              **Plaintiff,**

        **-vs-**

**CONSTELLATION BRANDS, INC.,
JOHN BOGNASKI, JOHN ELLIOTT,
SHELDON RICHARDSON, BARBARA
BAGSHAW, CLAYTON BROWER,**
Individually and In Their Official Capacities,
                              **Defendants.**

---

## PRELIMINARY STATEMENT

Plaintiff, Vicky Sloth ("Plaintiff"), seeks redress for employment discrimination, based on sex, gender, race, national origin disability, including but not limited to sexual harassment, hostile work environment and retaliation suffered in her capacity as a Filipino female employee of defendants Constellation Brands, Inc. ("Constellation"), John Bognaski ("Bognaski"), John Elliot ("Elliott"), Sheldon Richardson ("Richardson"), Barbara Bagshaw ("Bagshaw") and Clayton Brower ("Brower").

Defendants Bognaski, Elliott, Richardson, Bagshaw and Brower are each named as defendants herein individually, and in their respective official capacities as Director of East Coast Bottling Operations, Bottling Supervisor, Senior Line Operator, Human Resources Manager  and General Manager of defendant Constellation. Plaintiff was deliberately and intentionally discriminated against by defendants on account of her race,

1

national origin, age, color and sex and disability. Plaintiff was subjected to a hostile work environment and suffered retaliation because of internal and external complaints about discrimination. The conduct of the defendants was and is in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq., 42 U.S.C. § 1981, Article 15 of the New York Executive Law, §296 and the ADA.

## PARTIES

1. Plaintiff is, and was at all times herein mentioned, a resident of the Town of Naples, County of Ontario, State of New York.

2. Upon information and belief, defendant Constellation is a Delaware corporation, operating and doing business in New York State as an Authorized Foreign Business Corporation with a principal place of business at 116 Buffalo Street, Canandaigua, New York 14424.

3. Upon information and belief, at all times mentioned herein, defendant Bognaski is and was a resident of the County of Ontario, State of New York.

4. Upon information and belief, at all times mentioned herein, defendant Elliot is and was a resident of the County of Ontario, State of New York.

5. Upon information and belief, at all times mentioned herein, defendant Richardson is and was a resident of the County of Ontario, State of New York.

6. Upon information and belief, at all times mentioned herein, defendant Bagshaw is and was a resident of the County of Ontario, State of New York.

2

7. Upon information and belief, at all times mentioned herein, defendant Brower is and was a resident of the County of Ontario, State of New York.

8. Defendant Constellation is an "employer" within the meaning of, and is subject to liability pursuant to, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e et seq., 42 U.S.C. Section 1981 and Article 15 of the New York Executive Law §296.

9. At all times relevant, defendants Bognaski, Elliott, Richardson, Bagshaw, and Brower by virtue of their managerial and supervisory positions within Constellation, are deemed employers within the meaning of, and are subject to liability pursuant to, Title VII of the Civil Rights Act of 1964, as amended, 29 U.S.C. Section 621 et seq., 42 U.S.C. Section 1981, and Article 15 of the New York Executive Law §296.

## JURISDICTION AND VENUE

10. The jurisdiction of this federal district court is invoked pursuant to section 1337 of the United States Judicial Code, 28 U.S.C. Section 1337 and Section 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e-5. The Court has supplemental jurisdiction to adjudicate plaintiff's claims under New York Executive Law § 63 (12), Article 15 of the New York Executive Law ("Human Rights Law"), and any other state claim that may be alleged pursuant to 28 U.S.C.A. §1367(a).

11. Venue of this complaint is invoked pursuant to Section 1391 of the United States Judicial Code, 28 U.S.C. Section 1391, and has been properly laid in the Western

3

District of New York as the unlawful employment practices complained of were committed within the jurisdictional territory of the Western District of New York and, upon information and belief, all parties are residents of the Western District of New York.

12. Defendant Constellation is a corporation and an employer engaged in an industry that affects commerce and is subject to liability pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, 42 U.S.C. Section 1981 and New York Executive Law Section 296.

13. Defendant Constellation is a corporation and is a "person" within the meaning of Section 701(a) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e-(a), 42 U.S.C. Section 1981 and New York Executive Law Section 296.

## COMPLIANCE WITH THE JURISDICTIONAL REQUIREMENTS OF TITLE VII

14. All conditions precedent to jurisdiction under Section 706 of Title VII, 42 U.S.C. Section 2000e-5(f)(3) have been complied with.

15. Plaintiff caused a charge of discrimination, sexual harassment and retaliation to be filed with the United States Equal Employment Opportunity Commission ("EEOC") in accordance with Section 706 of Title VII of the Civil Rights Act of 1964, as amended, Section 2000e-5.

4

16. On or about October 28, 2010, plaintiff received a Notification of Right-to-Sue letter from the EEOC. This Complaint has been filed within ninety (90) days of plaintiff's receipt of said Notification of Right-to-Sue letter.

## FACTUAL ALLEGATIONS

17. In or around December 1980, Plaintiff, a Filipino female, commenced her employment with defendant Constellation at said defendant's Canandaigua, New York facility.

18. Plaintiff remained employed with defendant Constellation as a Line Attendant until her discriminatory discharge on or about February 28, 2009, following constant and continuing sexual harassment, discrimination, and retaliation by defendants.

19. At all times mentioned herein, plaintiff was a satisfactory employee.

20. Defendants' proffered reason for Plaintiff's termination was pretextual and the real reason was unlawful retaliation for Plaintiff's internal and external complaints of discrimination and sexual harassment.

21. During the course of her employment with defendants, Plaintiff was continually and repeatedly subjected to sexual harassment and sexual discrimination causing Plaintiff physical, emotional, and psychological injury.

22. Throughout her employment with Defendants, Plaintiff was denied promotional, job and training opportunities because of her national origin and because she refused

sexual advances of male coworkers, supervisors and managers.

23. Throughout Plaintiff's employment, Defendants tolerated and condoned the existence
of a hostile work environment permeated with inappropriate sexual talk, quid pro quo
sexual harassment.

24. During Plaintiff's employment, there existed within the workplace a practice and
culture of men in management positions using their positions, powers and authority to
pressure female employees for sex and romantic relationships.

25. During her period of employment with Defendants, Plaintiff was repeatedly subjected
to vile and vulgar speech, quid pro quo sexual harassment and sexual touching, all of
which constituted a hostile work environment.

26. During the early 1980's, Plaintiff's co-worker Harry Davis frequently walked behind
Plaintiff, grabbed the belt loop on Plaintiff's slacks and un-hooked her bra.

27. Plaintiff complained about Mr. Davis's conduct to her supervisor, but plant
management took no action to remedy the situation.

28. Plaintiff was born and raised in the Philippines.

29. Throughout her employment with defendants, Plaintiff was ridiculed and insulted by
coworkers because of her national origin such as being told to go back to her country.

30. Management was aware of such conduct by Plaintiff's coworkers, but failed to
remedy the conduct.

31. Upon information and belief, Plaintiff was denied training and promotional

6

opportunities because of her national origin.

32. Plaintiff was treated worse and differently than her similarly situated coworkers of a different race and national origin with respect to training, job opportunities, promotion and discipline.

33. During the early 1980's, defendant Brower, who was a plant supervisor at that time, and is now the General Manager, repeatedly asked Plaintiff to meet him in a hotel to have sex.

34. On one occasion, Plaintiff agreed to babysit defendant Brower's children on a Saturday. When Plaintiff arrived at defendant Brower's house, defendant Brower kissed the Plaintiff and told her to go into his bedroom. Plaintiff refused and left.

35. At various times thereafter, defendant Brower subjected Plaintiff to sexual proposition.

36. On another occasion, bottling room supervisor Dave Mitchell asked Plaintiff to accompany him to a storage room at work to look for boxes.

37. Upon arriving in the storage room, Dave Mitchell grabbed the Plaintiff, began kissing her, and demanded that she have sex with him.

38. Plaintiff refused and broke free.

39. Dave Mitchell warned Plaintiff not to tell anyone what happened.

40. Plaintiff did not disclose the incident at the time because she was afraid that she might lose her job if she told anyone of the incident.

7

41. Plant supervisor, Mike Hershberger subjected Plaintiff to several instances of sexual harassment, including making obscene comments to Plaintiff such as "I will lick all over your body," and "you look good enough to eat."

42. On one occasion, Mike Hershberger summonsed Plaintiff to his office.

43. When Plaintiff arrived in his office, Hershberger showed her pornographic on his computer.

44. On another occasion, Mike Hershberger gave Plaintiff a photograph of a male penis and asked her to give it to another female co-worker.

45. Plaintiff refused and threw the picture away.

46. In the early 1990's, defendant John Elliott became a bottling room supervisor, and Plaintiff's direct supervisor.

47. For the first several months of his employment as a bottling room supervisor, defendant Elliott subjected Plaintiff to numerous sexual propositions and foul verbal attacks, including stating he would lick plaintiff's private parts and make her feel so good that she would never want to see another man.

48. When Plaintiff refused defendant Elliott's propositions, he would assign her to dirty and demeaning jobs at the plant.

49. Defendant Elliott also refused to recommend Plaintiff for promotions at the plant in retaliation for her refusals of his sexual advances, despite the fact that Plaintiff was qualified for other jobs.

8

50. In approximately 1993 or 1994, defendant Sheldon Richardson, an employee at the plant, was transferred to work on the same shift that Plaintiff worked on.

51. Immediately after he was transferred to Plaintiff's shift, defendant Richardson began to subject Plaintiff to foul verbal sexual harassment.

52. Plaintiff reported Richardson's conduct to the human resources department, but management took no action to remedy the situation.

53. In approximately 1994 or 1995, following a company picnic, several co-workers, including defendant Richardson, went to Plaintiff's house.

54. At some point during the evening, Plaintiff fell asleep.

55. She awakened to find defendant Richardson standing over her.

56. Her blouse was undone and her shorts were partially unzipped.

57. The zipper of her shorts caught her skin, causing a scrape and some bleeding, which awakened Plaintiff.

58. Upon awakening, Plaintiff asked defendant Richardson what he was doing. He told Plaintiff not to tell anyone, and threatened to "destroy" her and damage her car if Plaintiff told anyone of his conduct.

59. When Plaintiff returned to work after the incident defendant Richardson made perverse comments, sexually explicit gestures, and whistled at Plaintiff.

60. Plaintiff complained of defendant Richardson's conduct to the human resources department manager about defendant Richardson's conduct at her house and about his

continuing sexual harassment of Plaintiff at work.

61. Management told Plaintiff that the company could not take any action, because defendant Richardson's attempted attack on Plaintiff occurred outside of the plant.

62. Plaintiff called the police about Richardson's attack on her in her home

63. A police officer came to the plant and took Plaintiff's complaint against defendant Richardson.

64. Shortly after this incident, Plaintiff had a panic attack at work and was taken to Thompson Hospital by ambulance.

65. Defendant Richardson continued to make sexual and obscene comments and gestures toward Plaintiff.

66. Richardson's conduct was continuous and ongoing, throughout the course of Plaintiff's employment.

67. Plaintiff made numerous complaints about defendant Richardson's conduct to the human resources department over the years, but no action was taken against defendant Richardson by management.

68. In approximately 1998, defendant John Bognaski, Director of East Coast Bottling Operations, began a long-running and continuous pattern of quid pro quo sexual harassment and retaliation against Plaintiff.

69. On one occasion in the winter of 1998, defendant Bognaski offered to help Plaintiff shovel the snow off of her car when she was preparing to leave work for the day.

70. When walking out to Plaintiff's car, defendant Bognaski grabbed Plaintiff and began kissing her.

71. Plaintiff told defendant Bognaski to stop, but he warned her not to tell anyone or he would have her fired.

72. Plaintiff was scared that defendant Bognaski would make good on his promise to have her fired so she did not tell anyone of the incident.

73. Following the incident in the winter of 1998, defendant Bognaski subjected Plaintiff to continual sexual talk and quid pro quo sexual harassment.

74. Following defendant Richardson's attempted sexual assault of Plaintiff, Plaintiff had requested that she not work directly with defendant Richardson.

75. In approximately 1999, defendant Elliott assigned Plaintiff to work with defendant Richardson.

76. Prior to defendant Elliott's assignment in 1999, management had been willing to accommodate Plaintiff's request not to work directly with defendant Richardson.

77. When defendant Elliott assigned Plaintiff to work with defendant Richardson in 1999, Plaintiff refused the assignment, because she knew defendant Richardson would harass her.

78. Plaintiff was reprimanded for her refusal to work next to Richardson and sent home for two days.

79. Upon returning to work, defendant Bognaski asked to see Plaintiff in his office.

80. Defendant Bognaski asked Plaintiff why she refused to work with defendant Richardson.

81. When Plaintiff explained that her refusal was due to defendant Richardson's attempt to rape her in her home and his continued harassment of her, defendant Bognaski told Plaintiff that he could fire her for her refusal.

82. Plaintiff began crying, upon which, defendant Bognaski made her accompany him into a storage room attached to his office.

83. Defendant Bognaski then told Plaintiff that if she did not perform oral sex on him, he would fire her.

84. Plaintiff refused at first, but then reluctantly got on her knees and performed oral sex on defendant Bognaski for fear that she would be fired.

85. Plaintiff did not tell anyone of the incident at the time because she was afraid that she would lose her job if she complained of defendant Bognaski's actions.

86. In approximately 2003, following the finalization of Plaintiff's divorce from her husband, defendant Bognaski increased his interest in Plaintiff and began an even more aggressive campaign of sexual harassment, including but not limited to propositioning Plaintiff, and repeatedly telling her that he wanted her to come to his office to have sex.

87. When Plaintiff refused his advances, defendant Bognaski assigned her to work with defendant Richardson in retaliation.

12

88. Defendant Bognaski knew of Plaintiff's fear and distrust of Richardson.

89. Plaintiff told defendants that she refused to work with defendant Richardson because of his attempt to rape her and because of his history of sexual harassment toward her.

90. On her return to work after being suspended for refusing to work defendant Richardson defendant Elliott told Plaintiff to go to defendant Bognaski's office.

91. As instructed plaintiff went to Bognaski's office.

92. Defendant Bognaski sexually assaulted Plaintiff in his office.

93. Defendant Bognaski then told Plaintiff not to complain to anyone, because nobody would believe her and he would have her fired if she did complain.

94. Plaintiff was scared that she would lose her job if she complained, and so she did not tell anyone about defendant Bognaski's attack at the time.

95. Following this attack, defendant Bognaski repeatedly made sexual advances toward plaintiff.

96. When the Plaintiff refused, defendant Bognaski would assign Plaintiff to work with defendant Richardson as punishment.

97. On one occasion in April of 2006, defendant Bognaski left a message for Plaintiff on her cell phone, stating, "when you and the girls are done going out, call me so that I can meet you, and then we will see what happens after that."

98. Plaintiff was in Florida at the time, and her boyfriend Jeff Smith heard the message.

99. Jeff Smith contacted one of Plaintiff's co-workers because he was concerned, and

allowed her to listen to the message.

100. When Plaintiff returned to work after her vacation, defendant Bognaski confronted her and said that Plaintiff had "almost gotten him in trouble about the cell phone message."

101. Plaintiff's yearly job review occurred shortly after that.

102. Plaintiff was told that she would be receiving a two percent raise for the year.

103. Most of Plaintiff's coworkers received raises of between three and five percent that year.

104. Plaintiff asked defendant Bognaski why she was receiving a smaller pay raise than the rest of her colleagues.

105. Defendant Bognaski replied, "because you almost got me in trouble with the cell phone message.

106. On or about April 28, 2007, Plaintiff attended the wedding reception of a coworker.

107. Defendants Elliott and Bognaski were also present at the reception.

108. At the wedding reception, Plaintiff asked defendant Elliott if she could take the next week off, because her sister was visiting her from the Philippines.

109. Defendant Elliott told her that she would have to ask defendant Bognaski.

110. Plaintiff asked defendant Bognaski for time off because her sister was visiting from the Philippines.

111. Bognaski told Plaintiff that he would discuss it with her later. Plaintiff consumed

14

several alcoholic beverages at the reception.  Defendant Bognaski took advantage of Plaintiff's intoxicated state.

112.   Plaintiff remembers waking up in an unknown room, with defendant Bognaski standing over her.

113.   Plaintiff was lying on a bed, unclothed.

114.   She asked defendant Bognaski where she was, and he refused to tell her.

115.   Plaintiff asked defendant Bognaski what happened and he replied, "I took advantage of you," I think you can have the week off now."

116.   Defendant Bognaski then took Plaintiff home, and told her that he would fire her if she told anyone what had happened.

117.    Plaintiff did not tell anyone what happened because she was afraid of losing her job.

118.   In April 2008, Plaintiff had four weeks vacation time starting on April 21, 2008.

119.   Defendant Bognaski told Plaintiff to call him while she was on vacation so that he could meet her somewhere.

120.   Plaintiff refused to call defendant Bognaski when she was on vacation.

121.   When Plaintiff returned to work, defendant Bognaski demanded to know why she had not called him, and stated that Plaintiff "owed him big time."

122.   While Plaintiff was on vacation, a company party had taken place, at which all of the employees were given gifts.

123.   Plaintiff did not attend the party, and upon returning to work, asked a supervisor, Steve Bloom, where her gift was.

124.   Steve Bloom replied that Plaintiff's gift was in defendant Bognaski's office.

125.   Plaintiff asked Steve Bloom to retrieve her gift from defendant Bognaski's office.

126.   After Steve Bloom retrieved Plaintiff's gift, defendant Bognaski confronted Plaintiff, about asking Steve Bloom to pick up her gift and stated "I put the gift in that little room so that you could go get it yourself."

127.   Plaintiff interpreted this remark to mean that defendant Bognaski had planned to sexually assault her again in the room to his office.

128.   During the first week of July 2008, defendant Bognaski repeatedly propositioned Plaintiff and demanded that she go to his office.

129.   He told Plaintiff that only one assembly line would be running on July 3, 2008 and that "she could take half a day off, but she had to go to his office when she punched out."

130.   Plaintiff refused to go to defendant Bognaski's office, and he angrily confronted her, stating that he had shut down lines and sent people home so that she could come into his office.

131.   Plaintiff felt that Bognaski wanted to get her to his office alone so he could sexually assault her again.

132.   During the summer of 2008, Richard Sands, the CEO of Constellation, visited the

16

Canandaigua plant.

133. After his visit, Plaintiff asked defendant Bognaski what Richard Sands thought about the plant.

134. Defendant Bognaski replied, "I told Richard that I am fucking you," and Bognaski laughed and walked away.

135. On that same day, Plaintiff informed defendant Bognaski that someone had carved "Good morning nipples" into Plaintiff's workstation.

136. Defendant Bognaski laughed and refused to take any further action.

137. Plaintiff was on vacation from July 28, 2008 through August 3, 2008.

138. During the month of July, before Plaintiff's vacation began, defendant Bognaski repeatedly propositioned her and told her to call him while she was on vacation presumably to have sex with her.

139. Plaintiff did not call defendant Bognaski while on vacation, and when she returned to work on August 4, 2008, he told her, "I want to give you your birthday present. I want to put my cock in your mouth."

140. Plaintiff refused to engage in sexual activity with defendant Bognaski.

141. At the end of the day, Plaintiff learned that she was scheduled to work with defendant Richardson the next day, in retaliation for refusing defendant Bognaski's sexual advances.

142. Upon information and belief, Bognaski instructed Elliot to assign Plaintiff to work

with Richardson in retaliation of her refusal of Bognaski's sexual advances.

143.   When Plaintiff went into work the next day, she asked defendant Elliott to change her assignment so that she would not have to work with defendant Richardson.

144.   Defendant Elliott refused to change Plaintiff's assignment and said she would have to ask defendant Bognaski.

145.   Defendant Elliott left for a short time to consult with Bognaski about Plaintiff's request and upon returning, told Plaintiff that she could either accept the assignment or go home and possibly be fired the next day.

146.   When Plaintiff continued to express her reluctance to work with defendant Richardson, defendant Elliott began screaming at her, and only stopped when confronted by a co-worker.

147.   Defendant Elliott then told Plaintiff to go home for the day, and to come in the next day to talk with defendants Bognaski and Bagshaw.

148.   When Plaintiff met with defendants Bognaski and Bagshaw the next day, they told her that she could be fired for her continued refusal to work with defendant Richardson.

149.   Plaintiff met with defendants Bognaski, Bagshaw, and Brower one or two more times over the next few days.

150.   They continued to reprimand her and told her that she was going to receive three days off without pay.

18

151.   The following week, Plaintiff met with defendant Bagshaw alone and told her about the continued sexual harassment and assaults Plaintiff had been subjected to by defendant Bognaski.

152.   Defendant Bagshaw told Plaintiff that her complaints would be investigated.

153.   A few days later, Plaintiff felt shortness of breath and severe chest pain while at work due to the stressfulness of having disclosed to Bagshaw, defendant Bognaski's sexual harassment and threats to fire her if she ever told anyone,

154.   Plaintiff was out of work on medical disability being treated for Post Traumatic Stress Disorder and agoraphobia related to the hostile work environment she suffered at work.

155.   The aforementioned hostile environment was tolerated and condoned by management at Defendants Constellation.

156.   In retaliation for complaining about discrimination and sexual harassment, including the filing of her charge of discrimination with the EEOC, Plaintiff's employment was terminated on or about February 28, 2009.

157.   There was no legitimate non-discriminatory basis for Plaintiff's termination on or about February 28, 2009.

158.   At the time of her termination, plaintiff was disabled within the meaning of New York Human Rights Law and federal ADA.

159.   Defendants failed to offer plaintiff a reasonable accommodation to allow her to

safely return to work.

160.   Defendants' termination of plaintiff's employment while out on disability leave
       was violative of Plaintiff's right's under New York and federal law.

### AS AND FOR A FIRST CAUSE OF ACTION

161.   Plaintiff repeats and re-allege paragraphs 1 through 160 of the Complaint as if
       fully stated herein.

162.   Defendants, their agents, servants and/or employees by their conduct described
       above intentionally, willfully and without justification, violated Title VII of the
       Civil Rights Act of 1964, as amended 42 U.S.C. 2000e.

### AS AND FOR A SECOND CAUSE OF ACTION

163.   Plaintiff repeats and re-allege paragraphs 1 through 162 of the Complaint as if
       fully stated herein.

164.   Defendants, their agents, servants and/or employees by their conduct herein
       intentionally, willfully and without justification, violated New York State
       Executive Law Section 296 governing unlawful sexual harassment and
       discrimination in the workplace.

### AS AND FOR A THIRD CAUSE OF ACTION

165.   Plaintiff repeats and re-allege paragraphs 1 through 164 of the Complaint as if
       fully stated herein.

166.   Defendants, their agents, servants and/or employees by their conduct herein

intentionally, willfully and without justification, violated New York and Federal Law (ADEA) prohibiting age discrimination in the workplace.

**AS AND FOR A FOURTH CAUSE OF ACTION**

167.    Plaintiff repeats and re-allege paragraphs 1 through 166 of the Complaint as if fully stated herein.

168.    Defendants, their agents, servants and/or employees by their conduct herein intentionally, willfully and without justification, violated 42 U.S.C. Section 1981 governing unlawful discrimination in the workplace.

**WHEREFORE,** plaintiff Vicky Sloth seeks reinstatement, compensatory damages, back pay, front pay and a substantial punitive damages award.   Plaintiff demands judgment against defendants the Constellation Brands, Inc., John Bognaski, John Elliott, Sheldon Richardson, Barbara Bagshaw, and Clayton Brower, Individually and In Their Official Capacities and their officers, employees, agents, and other persons acting in concert or participation with them on the claims of this complaint, as follows:

a.   An award requiring Constellation Brands, Inc., to re-employ and reinstate Ms. Sloth to a position substantially equal to the position of Line Attendant (Senior Operator), the position Plaintiff held prior to her unlawful termination;

b.   An award of back pay, lost benefits and bonuses, together with prejudgment interest;

c.   An award of front pay, future benefits, and bonuses, together with post-

21

judgment interest;

d. The amount of any lost or diminished Social Security benefits, and retirement or other contributions that would have been made by the defendant and any expenses incurred for job searches;

e. An award of compensatory damages in the amount of One Hundred Million Dollars ($100,000,000.00) for past, present and future pain and suffering;

f. An award of punitive damages for the outrageous conduct of defendants;

g. An award of attorney's fees and associated expenses of this litigation, including expert and witness fees and deposition and other costs of suit; and

h. An award of such other and further relief as the court deems just.

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY**

Dated: January 21, 2011
Rochester, New York

**BROWN & HUTCHINSON**

By: _____

**Michael Cobbs, Esq.,** *Of Counsel*
Attorney for Plaintiff, Vicky Sloth
925 Crossroads Building
Two State Street
Rochester, New York 14614
(585) 454-5050 (phone)
(585) 454-5066 (facsimile)

## VERIFICATION

STATE OF NEW YORK   )ss:
COUNTY OF MONROE   )

Vicky Sloth, being duly sworn, deposes and says that she is the plaintiff in the within

action, that she has read the contents of the Complaint; that the same is true to her own

knowledge, except as to the matters, if any, therein stated to be alleged on information and

belief, and that as to those matters she believes them to be true.

Vicky C. Sloth
Vicky Sloth

Sworn to before me January 21, 2011

MICHAEL COBBS
Notary Public, State of New York
#5004548 Wayne County
Commission Expires March 23, 2014